# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MANUEL GERONIMO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 03-0918 (JDB)** |
| | ) | |
| **EXECUTIVE OFFICE FOR THE** | ) | |
| **UNITED STATES ATTORNEYS** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF MICHAEL SEPANEK
## FEDERAL BUREAU OF PRISONS

COMES NOW, Michael Sepanek, Assistant Administrator of the Correctional Services

Branch, Federal Bureau of Prisons, who declares and states the following:

1.    I am employed by the Federal Bureau of Prisons (BOP) as Assistant Administrator

of the Correctional Services Branch. My business office is located at the Central Office in

Washington, D.C. I have held my current position since June 2003. I started working in the

BOP on March 1990, and have held different positions of increasing importance in the prison

setting, to include Supervisory Correctional Officer (Lieutenant) and Chief Security Officer

(Captain) at several institutions.

2.    As Assistant Administrator of the Correctional Services Branch, I am responsible

for the safe, humane care and custody of federal inmates in BOP facilities, including security,

prisoner transportation, central inmate monitoring, inmate discipline, case management,

psychology, and religious services. My division also maintains records of all violent incidents

involving inmates and oversees disciplinary hearings concerning those incidents.

3.     The statements in this declaration are based upon my personal knowledge, belief and experience, and upon information made available to me in the course of my official duties as Assistant Administrator of the Correctional Services Branch and my prior positions in the BOP.

4.     Prior to September 19, 2002, inmates housed in federal institutions were allowed to retain photocopies of their Pre-sentence Investigation Reports (PSRs) and Statement of Reasons (SORs). However, because the BOP identified an increase in security problems associated with inmates' possessing these documents, the BOP recognized an emerging national problem, where inmates pressure, or "shake down," other inmates to see their PSRs and SORs. Inmates with sensitive issues in their PSRs and SORs are forced to pay "protection" or extorted by other inmates to provide illicit services lest the information be disclosed to the general population. Sometimes they are physically abused by other inmates if they are thought to be informants, gang members, have financial resources, or have committed certain crimes (such as sexual abuse of minors). Some inmates seek protection from the BOP and are placed in protective custody. Other inmates risk injury or death if they stay in general population and fail to provide the money or services demanded. Inmates who refuse to show their PSRs and SORs to these predatory inmates are treated as if they have something to hide, and face similar risks if they stay in general population.

5.     In 2000, the BOP's South Central Regional Office expressed concern over the number of inmates in that region who were being threatened, coerced, and in some cases physically assaulted by other inmates based on information contained in their PSRs and SORs. It is believed one inmate may have been murdered as a result of this new shake-down practice, although the murder may have also been motivated by a drug debt. Based on this information,

2

the BOP identified this behavior as a trend that would continue to increase in frequency and eventually affect all regions.

   6.  Here are some examples of these problems that were identified and documented by BOP investigators:

a.  In March 1996, an inmate at FCI Seagoville, Texas was transferred for his protection after three inmates forced him to show them his PSR, which revealed he cooperated with the government and received a USSG §5K1.1 reduction.  In the same month, institution staff at Seagoville received a call from another inmate's attorney, reporting that an inmate had taken a copy of his PSR and other inmates labeled him a "snitch."  After confirmation, BOP staff removed him from the compound and transferred him to another BOP institution for his protection.

b.  In July 1998, an inmate at FCI Oakdale, Louisiana, with a conviction of Sexual Exploitation of Children, had to be placed in protective custody after it was confirmed that two inmates had forced him to show them his PSR, and extorted protection money from him lest they inform the general population about his criminal acts.

c.  In April 1998, an inmate at FCI Forrest City, Arkansas, with a conviction of Interstate Transportation of Child Pornography, was forced by inmates to show them a copy of his PSR containing a description of the offense, which resulted in his placement into protective custody and transfer to another institution.

d.  In September 1998, an inmate at FCI El Reno, Oklahoma, was threatened by a gang of inmates to show them his PSR, because they heard he sexually abused a young girl.  BOP placed him in protective custody and transferred him to another institution.

3

e.  In October 1997, five inmates at United States Penitentiary ("USP") Beaumont, Texas forced an inmate to show his PSR to them. It revealed he had cooperated and was still cooperating with the government in drug investigations. The inmates told him he had "messed up" and had better get a knife quick, and they knew where he could get one for the right price. BOP placed the inmate in protective custody and transferred him to another BOP institution.

f.  In July 1997, also at USP Beaumont, an inmate asked a Lieutenant for protection after a group of inmates from two gangs approached him, asked to see his PSR, then ordered him to "lock up" because they had word he was "hot." A note had been dropped by inmates which read, "Don't let that thief **** out of the hole because he is a dead mother ****** when we get him! Think I'm playing? Try us and see!!" BOP placed the inmate in protective custody and transferred him to another institution.

g.  In 1999, USP Beaumont documented 18 cases where PSRs, or the information therein, became known to the population and caused security concerns for the subject inmates.

h.  In September 2000, at USP Beaumont, an inmate sustained a serious eye injury after being assaulted for refusing to show another inmate his PSR.

i.  At USP Leavenworth, an inmate was ordered by another inmate to provide his PSR to check out his offense conduct, which included kidnaping and sexual assault of a minor. Another inmate ordered him to lock up or pay protection. He failed to ask for protective custody, and was murdered shortly thereafter.

j.  Another inmate at USP Leavenworth reported to BOP staff that he had been assaulted after inmates forced him to reveal his PSR, and it reflected cooperation with law

enforcement.

k.  In 2000, an inmate at FCI Oxford, Wisconsin was told by a gang member to come to the recreation yard with his PSR. He brought them his PSR but left out a page reflecting DEA cooperation. The gang pressured the inmate to join them to work for them or he would be assaulted. BOP placed him in protective custody.

l.  In 2000 at FCI Beckley, West Virginia, an inmate's PSR was taken from his personal property by another inmate, and posted on the unit bulletin board. It reflected offense conduct involving possession of child pornography. BOP immediately placed him in protective custody and transferred him to another institution.

m.  In 2000, at FCI Cumberland, Maryland, BOP staff removed an inmate from general population and into protective custody after inmates forced him to show his PSR, which showed cooperation with the DEA. Staff discovered a note containing the following: "We know what's up with **** in Cell ***. You need to take him off the yard by Friday. We don't allow DEA agents here. If he still here we will split his head open. He is no longer welcome here."

7.  Based upon these serious threats to the security of federal correctional institutions, on September 19, 2002, the BOP Director issued a change in "Release of Information" policy, through Program Statement 1351.07. This program statement prohibits most inmates (pretrial detainees are not affected) from retaining photocopies of their PSRs and SORs in their personal possession, thereby making such possession contraband. Instead, inmates may access their documents through the Unit Team and cause those documents to be transmitted to courts and/or attorneys as needed. This takes away the ability to be coerced into showing PSRs and SORs, and

5

applies to everyone so that an unwillingness to show the documents cannot be considered an unwillingness due to government cooperation, financial resources, or a past sexual offense involving minors.

8.    While inmates are prohibited by the new policy from obtaining or possessing photocopies of their SORs or PSRs, inmates remain entitled to access their own PSRs and SORs under the Freedom of Information Act.  The BOP provides inmates reasonable opportunities to access and review their PSRs, SORs, or other sentencing documents by submitting a request to their Unit Teams.

9. A copy of each inmate's PSR is contained in his Central File in the facility in which he being held and may be accessed by request to the Unit Team as is required at his facility.  A sentenced inmate may review and take notes pertaining to his PRS; however, copying and retention of the PSR in the cellblock is not permitted.  Thus, inmate Geronimo may obtain access to his PSR, but he is not allowed to maintain a copy of it in the cellblock.

Pursuant to Title 28, United States Code, Section 1746,  I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _23_ day of February, 2006.

Michael Sepánek
Assistant Administrator
Correctional Services Branch
Federal Bureau of Prisons
Washington, D.C.

6